# EXHIBIT A

# NON-DISCLOSURE AGREEMENT

This Non-Disclosure Agreement (this "Agreement") is made as of November 3, 2022, by and between Digital Virgo Group ("Party A") and Goal Acquisitions Corp. ("Goal").  The party disclosing its Confidential Information to the other party pursuant to the terms of this Agreement is referred to herein as "Disclosing Party" and the party receiving the Disclosing Party's Confidential Information pursuant to the terms of this Agreement is referred to herein as "Receiving Party".

RECITALS:

WHEREAS, Disclosing Party may furnish the Receiving Party with, and Receiving Party may otherwise obtain, Confidential Information of the Disclosing Party (each, as defined below) in connection with one or more potential transactions between Party A and/or its affiliates, on the one hand, Goal and/or its affiliates and/or one or more other third parties, on the other hand (individually, each a "Transaction" and collectively, "Transactions");

WHEREAS, Disclosing Party desires to maintain the confidentiality and proprietary nature of the Confidential Information, and the confidentiality of all negotiations and discussions relating to Transactions;

WHEREAS, the parties desire to enter into this Agreement to govern their rights and obligations with respect to the Confidential Information related to the Transactions; and

WHEREAS, to induce each other to exchange and/or furnish Confidential Information, each party is willing to execute this Agreement.

AGREEMENT:

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1. The following defined terms are used herein:

"Confidential Information" means (i) any and all information of any type (whether owned by Disclosing Party or another person) and in any medium (written, oral, observed, electronic or otherwise) furnished (whether before, on or after the date hereof) by Disclosing Party or Disclosing Party's Representatives (as defined below) to Receiving Party or Receiving Party's Representatives, including, without limitation, information relating to any Transaction (including the existence of any Transaction, the fact that discussions regarding a Transaction may be occurring and the identity of any parties involved in any Transaction), and (ii) any and all analyses, compilations, forecasts, studies or other documents prepared by Receiving Party or its Representatives in connection with Receiving Party's review of, evaluation of, or interest in, a Transaction which contain or reflect any such information; provided, however, that Confidential Information shall not include information that the Receiving Party can demonstrate by contemporaneous written evidence (A) is or becomes publicly available other than as a result of a disclosure by Receiving Party or its Representatives; or (B) is or becomes available to Receiving Party or its Representatives on a non-confidential basis from a source (other than Disclosing Party or Disclosing Party's Representatives providing the information) that is not prohibited from disclosing such information to Receiving Party or its Representatives by a legal, contractual or fiduciary obligation.  To the extent that any Confidential Information of Disclosing Party includes materials subject to the attorney-client privilege, Disclosing Party shall not be deemed to have waived or diminished, its attorney work-product protections, attorney-client privileges or similar protections and privileges as a result of disclosing any of its Confidential Information (including Confidential Information related to pending or threatened litigation) to Receiving Party or any of its Representatives.

"Representatives" means, when used with reference to Receiving Party or Disclosing Party, the directors, managers, members, officers, employees, affiliates, financing sources and investors listed on Exhibit A attached hereto as supplemented or modified from time to time, representatives (including, without limitation, advisors, consultants, attorneys, auditors and accountants) and agents of such party.

2. Receiving Party and Receiving Party's Representatives shall (i) keep the Confidential Information of Disclosing Party strictly confidential, (ii) safekeep the Confidential Information of Disclosing Party in a manner no less secure than it safekeeps its own confidential and proprietary information, but in no event less than a reasonable degree of care, (iii) segregate and keep the Confidential Information of Disclosing Party separate from other records, documents, drawings or similar materials of its own, (iv) not disclose any Confidential Information of Disclosing Party in any manner whatsoever (except as required by applicable law, regulation or legal process and only after compliance with paragraph 5 below), and (v) not use any Confidential Information of Disclosing Party other than in connection with evaluating a Transaction; provided, however, that Receiving Party may reveal the Confidential Information of Disclosing Party to Receiving Party's Representatives (a) who need to know such Confidential Information for the purpose of evaluating a Transaction, (b) who are informed of the confidential nature of such Confidential Information, and (c) who agree to be bound by the terms of this Agreement as if they were Receiving Party. Receiving Party will cause Receiving Party's Representatives to observe the terms of this Agreement, and will be responsible for any breach of this Agreement by any of Receiving Party's Representatives.

3. Receiving Party agrees and acknowledges that as between Disclosing Party and Receiving Party, the Confidential Information of Disclosing Party is and shall remain the sole and exclusive property of Disclosing Party and that no license or similar proprietary right is granted to Receiving Party hereunder.

4. Receiving Party and Receiving Party's Representatives will not (except as required by applicable law, regulation or legal process, and only after compliance with paragraph 5 below), without Disclosing Party's prior written consent, disclose to any person the fact that the Confidential Information of Disclosing Party exists or has been made available, that either Disclosing Party or Receiving Party is considering a Transaction or that discussions or negotiations are taking or have taken place concerning a Transaction or any term, condition or other fact relating to a Transaction or such discussions or negotiations, including, without limitation, the status thereof.

5. In the event that Receiving Party or Receiving Party's Representatives are requested pursuant to, or required by, applicable law, regulation or legal process to disclose any of the Confidential Information of Disclosing Party or that it is considering a Transaction, Receiving Party will notify Disclosing Party promptly so that Disclosing Party may seek a protective order or other appropriate remedy or, in Disclosing Party's sole discretion, waive compliance with the terms of this Agreement. In the event that no such protective order or other remedy is obtained, or that Disclosing Party waives compliance with the terms of this Agreement, Receiving Party will furnish only that portion of the Confidential Information of Disclosing Party which Receiving Party is advised by counsel is legally required and will exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the Confidential Information of Disclosing Party.

6. At any time upon the request of Disclosing Party or any of Disclosing Party's Representatives, Receiving Party will (i) within three business days destroy all copies of the written Confidential Information of Disclosing Party and Confidential Information of Disclosing Party in other tangible media in Receiving Party's or its Representatives' possession and confirm such destruction to Disclosing Party in a written notice signed by an officer of Receiving Party or, if Receiving Party is an individual, by Receiving Party, and (ii) deliver to Disclosing Party at Receiving Party's own expense any originals of such Confidential Information that may be in the possession of Receiving Party or its Representatives. All Confidential Information of Disclosing Party will continue to be subject to the terms of this Agreement.

7. This Agreement does not (i) impose an obligation to proceed with any Transaction, (ii) grant any intellectual property rights, including, but not limited to, rights or licenses to trademarks, inventions, copyrights or patents, (iii) create an agency or partnership, or (iv) grant Receiving Party the right to retain, distribute or commercialize any Confidential Information of Disclosing Party.

8. Receiving Party acknowledges to Disclosing Party that neither Disclosing Party nor its Representatives makes any express or implied representation or warranty as to the accuracy or completeness of the Confidential Information of Disclosing Party, and Receiving Party agrees that no such person will have any liability relating to such Confidential Information or for any errors therein or omissions therefrom. Receiving Party further agrees that it is not entitled to rely on the accuracy or completeness of the Confidential Information of Disclosing Party and that it will be entitled to rely solely on such representations and warranties as may be included in any definitive agreement with respect to a Transaction, subject to such limitations and restrictions as may be contained therein.

9. Neither party shall, directly or indirectly, for a period of two years after the date hereof, solicit for employment/engagement or (to the extent permitted by applicable law) hire/engage any person who is or was during the term of this Agreement or the year prior to the date of this Agreement an employee or consultant of the other party, or instigate, encourage or assist any third party to do the same. For the avoidance of doubt, an employee or consultant shall not be deemed to have been solicited if such person responds to a general public advertisement for job openings that was not targeted directly or indirectly at employees or consultants of the applicable party. Further, each party agrees that it will not at any time, orally or in writing, expressly or implicitly, make any negative or disparaging statements or comments to any existing or potential partner, investor, financing source, business relationship, client, customer, supplier or competitor of the other party regarding the other party, its business, affiliates, personnel, products or services.

10. Party A agrees that all (i) communications regarding any Transaction, (ii) requests for additional information, facility tours or management meetings, and (iii) discussions or questions regarding procedures or otherwise with respect to any Transaction, will be first submitted or directed to Goal's Chief Financial Officer or such person as may be designated for such purpose in a writing delivered to Party A. Party A and Goal acknowledge and agree that, unless and until a written definitive agreement (including a business combination agreement) concerning a Transaction has been executed, (a) Goal and Goal's Representatives are free to conduct the process with respect to a Transaction as Goal and Goal's Representatives, in Goal's sole discretion, determine, (b) Goal reserves the right, in its sole discretion, to change the procedures relating to its consideration or evaluation of a Transaction at any time without prior notice to Party A or any other person, to reject any and all proposals made by Party A or any of its Representatives with regard to a Transaction, and to terminate the discussions and/or negotiations with Party A at any time and for any reason, and (c) neither party nor any of such party's Representatives will have any liability to the other party or its Representatives with respect to a Transaction, whether by virtue of this Agreement, any other written or oral expression with respect to a Transaction or otherwise.

11. Receiving Party acknowledges that remedies at law would be inadequate to protect Disclosing Party against any actual or threatened breach of this Agreement by Receiving Party or its Representatives, and, without prejudice to any other rights and remedies otherwise available to Disclosing Party, Receiving Party agrees to the granting of injunctive relief in Disclosing Party's favor without proof of actual damages, proving the inadequacy of money damages, proving the likelihood of success, or (to the extent permitted by law) without posting a bond or other security. No failure or delay by Disclosing Party in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege thereunder.

12. Receiving Party acknowledges and agrees that the Confidential Information of Disclosing Party and Transactions have substantial independent economic value and that the Disclosing Party would

not disclose any of its Confidential Information to Receiving Party but for Receiving Party's strict compliance with each provision of this Agreement. Receiving Party shall hold harmless and indemnify Disclosing Party against any and all claims, judgments, costs, awards, expenses (including reasonable attorneys' fees), losses and liabilities of every kind arising from any breach of this Agreement or Receiving Party's use of the Confidential Information of Disclosing Party.

13. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without regard to conflicts of laws that would require the application of the laws of another jurisdiction. All claims, controversies or disputes arising under, related to or in connection with this Agreement between or among any of the parties hereto (and their Representatives), whether sounding in contract or tort, including arbitrability and any claim based on fraud (collectively, the "Covered Claims"), will be resolved by binding arbitration in Austin, Texas, in accordance with the following terms and conditions:

(a) Administrator. The arbitration of all Covered Claims will be administered by JAMS ("JAMS") in accordance with the JAMS Streamlined Arbitration Rules and Procedures (or any successor thereto) then in effect; provided, however, that (i) the parties hereto waive any right to jury; (ii) there shall be no interlocutory appellate relief (such as writs) available; (iii) discovery will be limited to matters which are directly relevant to the issues in the arbitration; and (iv) any award of the Arbitrator shall be final and binding and non-appealable.

(b) Arbitrator. The arbitration will be conducted by a single, neutral arbitrator ("Arbitrator"), to be selected in accordance with JAMS rules.

(c) Interim, Provisional or Emergency Relief. The Arbitrator may, in the course of the proceedings, order any interim, provisional or emergency relief, remedy or measure (including, without limitation, attachment, preliminary injunction, or the deposit of specified security) that the Arbitrator considers to be necessary, just and equitable. The failure of a party to comply with such an interim order may, after due notice and opportunity to cure such noncompliance, be treated by the Arbitrator as a default, and some or all of the claims or defenses of the defaulting party may be stricken and partial or final award entered against such party, or the Arbitrator may impose such lesser sanctions as the Arbitrator may deem appropriate. This paragraph will not preclude the parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction, and each of the parties irrevocably submits to the jurisdiction of the Superior Court and the Federal Court, located in Austin, Texas, in conjunction with an application for a provisional remedy.

(d) Jurisdiction/Venue/Enforcement of Award. The parties consent and submit to the exclusive personal jurisdiction and venue of the state and federal courts located in Austin, Texas to confirm any arbitration award granted pursuant to this Agreement, including, but not limited to, any award granting equitable relief, and to otherwise enforce this Agreement and carry out the intentions of the parties to resolve all Covered Claims through arbitration. This paragraph does not prevent the parties from enforcing the award of the arbitrator in the court of any other jurisdiction, to the extent permitted by law (for example, if property that is the subject of the award is located in another jurisdiction).

(e) Confidentiality. All arbitration proceedings will be closed to the public and confidential, and all records relating thereto will be permanently sealed, except as necessary, and only to the extent reasonably necessary, to obtain court confirmation of the judgment of the Arbitrator, and except as necessary, and only to the extent reasonably necessary, to give effect to *res judicata* and collateral estoppel (e.g., in a dispute between the parties that is not a Covered Claim), in which case all filings with any court will be sealed to the extent permitted by the court. Nothing in this paragraph is intended to, or shall, preclude a party from communicating with, or making disclosures to, its lawyers, tax advisors, auditors, lenders, investors, landlords, regulators and insurers, as necessary and appropriate or from making such other disclosures as may be required by law.

DocuSign Envelope ID: 1BF054D9-7E14-4969-B862-D15C8A300556

(f)     Fees and Costs.  The parties will initially share equally in the fees of the Arbitrator and the administrative costs of the arbitration; provided, however, that the prevailing party in the arbitration will be entitled to recover its fees and costs (including attorneys' fees) from the other party or parties.

14.     To the extent that any provision of this Agreement shall be found to be illegal or unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect.  The language of this Agreement shall be construed without regard to the identity or status of any person or persons who drafted all or any portion of this Agreement.  This Agreement contains the entire agreement between Party A and Goal concerning the subject matter hereof, and supersedes all previous agreements or understandings, whether written or oral, regarding the subject matter hereof.  No change, modification, extension or termination of this Agreement or waiver of the terms and conditions hereof will be binding upon a party, unless made in writing and signed by duly authorized representatives of the parties hereto.  This Agreement and the obligations hereunder may not be assigned by either party, except upon the prior written consent of the other party.  No party shall be deemed the drafter of this Agreement.  This Agreement represents the mutual agreement of the parties and has been drafted jointly.  This Agreement shall be interpreted in accordance with its fair meaning and no presumption against the drafter shall be used against any party, it being understood that any such principles are expressly waived.  Each party has consulted with or had a reasonably opportunity to consult with legal counsel and has been advised to consult with such counsel.

15.     Each party hereby confirms that it is aware and that its Representatives have been advised that the United States securities laws prohibit any person who has material non-public information about a company from purchasing or selling securities of such company or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person may purchase or sell such securities. Each party hereby confirms that it and its Representatives will take any action reasonably necessary or appropriate to prevent the use by it and them of any Confidential Information of the other party in a way that violates any antitrust or other applicable law, including the federal securities laws. Without limiting the foregoing, Party A agrees that it will not, and will cause its Representatives not to, use any Confidential Information of or disclosed by Goal to engage in transactions relating to securities of Goal or its affiliates or effect any other transaction in Goal or its affiliates, other than the Transactions.

16.     Party A shall not, for a period of the earlier of nine (9) months after the date hereof or the consummation of a Transaction between Party A and Goal (such earlier period, the "Non-Circumvention Period"), directly or indirectly (i) enter into any agreement with a third party for any transaction or business opportunity that is the same as, or substantially similar to, any Transaction disclosed by Goal or as to which Party A has received Confidential Information hereunder, (ii) enter into any agreement with any financing source or investor listed on Exhibit A attached hereto as supplemented or modified from time to time by mutual consent of Goal and Party A for any transaction or business opportunity unless such agreement is related to the Transactions, (iii) use or exploit (or attempt to use or attempt to exploit) any Confidential Information or any introduction made in clause (ii) of this Section 16 for any purpose other than the evaluation of the Transactions (with it being understood that nothing in this clause (iii) shall be deemed to limit, supersede or circumvent the restrictions in clauses (i) and (ii) of this Section 16), unless consented to in writing in a separate written agreement with Goal, or (iv) discuss any Confidential Information with any person (or any affiliate or Representative of such person) that may be a counterparty to any business opportunity (including any Transaction) disclosed by Goal.

17.     Reference is made to the final prospectus of Goal dated as of February 10, 2021 and filed with the SEC (File No. 333-252303) on February 11, 2021 (the "Prospectus").  Party A hereby represents and warrants that it has read the Prospectus and understands that Goal has established a trust account (the "Trust Account") containing the proceeds of its initial public offering (the "IPO") and the overallotment shares acquired by its underwriters and from certain private placements occurring simultaneously with the IPO (including interest accrued from time to time thereon) for the benefit of Goal's public stockholders

DocuSign Envelope ID: 1BF054D9-7E14-4969-B862-D15C8A300556

(including overallotment shares acquired by Goal's underwriters, the "Public Stockholders"), and that, except as otherwise described in the Prospectus, Goal may disburse monies from the Trust Account only: (a) to the Public Stockholders in the event they elect to redeem their Goal shares in connection with the consummation of Goal's initial business combination (as such term is used in the Prospectus) (the "Business Combination") or in connection with an extension of its deadline to consummate a Business Combination, (b) to the Public Stockholders if Goal fails to consummate a Business Combination within twenty four (24) months after the closing of the IPO, (c) with respect to any interest earned on the amounts held in the Trust Account, amounts necessary to pay for any taxes or (d) to Goal after or concurrently with the consummation of a Business Combination. For and in consideration of Goal entering into this Agreement and discussions with Party A regarding the possible Transaction (which may include a Business Combination), and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Party A hereby agrees on behalf of itself and its affiliates that, notwithstanding anything to the contrary in this Agreement, neither Party A nor any of its affiliates or Representatives do now or shall at any time hereafter (a) have any right, title, interest or claim of any kind in or to any monies in the Trust Account or distributions therefrom, or (b) have a right to make any claim against the Trust Account (including any distributions therefrom), regardless of whether such claim arises as a result of, in connection with or relating in any way to, this Agreement or any proposed or actual business relationship between Goal or its affiliates or Representatives, on the one hand, and Party A or its affiliates or Representatives, on the other hand, or any other matter, and regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability (collectively, the "Released Claims"); provided, however, that the Released Claims shall not include any claims brought by Party A in connection with the fraud, willful breach or intentional misconduct of Goal or any of its Representatives. Party A, on behalf of itself and its affiliates and Representatives, hereby irrevocably waives any Released Claims that Party A or any of its affiliates may have against the Trust Account (including any distributions therefrom) now or in the future as a result of, or arising out of, any negotiations, contracts or agreements with Goal, Goal, or their respective affiliates or Representatives and will not seek recourse against the Trust Account (including any distributions therefrom) for any reason whatsoever (including for an alleged breach of this Agreement or any other agreement with Goal or its respective affiliates or Representatives but excluding any claims brought by Party A in connection with the fraud, willful breach or intentional misconduct of Goal or any of its Representatives). Party A agrees and acknowledges that such irrevocable waiver is material to this Agreement and specifically relied upon by Goal and its respective affiliates and Representatives to induce Goal to enter in this Agreement, and Party A further intends and understands such waiver to be valid, binding and enforceable against Party A and each of its affiliates and Representatives under applicable law. To the extent Party A or any of its affiliates or Representatives commences any action or proceeding based upon, in connection with, relating to or arising out of any matter relating to Goal or its respective affiliates or Representatives, which proceeding seeks, in whole or in part, monetary relief against Goal or its respective affiliates or Representatives, Party A hereby acknowledges and agrees that, except in the case of the fraud, willful breach or intentional misconduct of Goal or any of its Representatives, Party A's and its affiliates' and Representatives' sole remedy shall be against funds held outside of the Trust Account and that such claim shall not permit Party A or its affiliates or Representatives (or any person claiming on any of their behalves or in lieu of any of them) to have any claim against the Trust Account (including any distributions therefrom) or any amounts contained therein. In the event Party A or any of its affiliates or Representatives commences any action or proceeding based upon, in connection with, relating to or arising out of any matter relating to Goal or its respective affiliates or Representatives (other than a claim brought by Party A in connection with the fraud, willful breach or intentional misconduct of Goal or any of its Representatives), which proceeding seeks, in whole or in part, relief against the Trust Account (including any distributions therefrom) or the Public Stockholders, whether in the form of money damages or injunctive relief, Goal or its respective affiliates and Representatives, as applicable, shall be entitled to recover from Party A and its affiliates the associated legal fees and costs in connection with any such action, in the event Goal or its respective affiliates or Representatives, as applicable, prevails in such action or

DocuSign Envelope ID: 1BF054D9-7E14-4969-B862-D15C8A300556

proceeding. Notwithstanding anything to the contrary herein, the provisions of this Section 17 shall survive indefinitely.

18. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by email, facsimile, portable document format (pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (including DocuSign) shall be as effective as delivery of a manually executed counterpart of this Agreement.

19. This agreement shall expire two (2) years after the effective date.

[Remainder of page intentionally left blank]

DocuSign Envelope ID: 1BF054D9-7E14-4969-B862-D15C8A300556

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date first above written.

**"Goal"**

Goal Acquisitions Corp.

By: *WT Duffy*
Name: William T. Duffy
Title: CFO/COO

**"PARTY A"**

Party A   Digital Virgo Group

By: _____
Name:
Title:

Name : Guillaume Briche

Title : Chairman of the company Lalbatros, CEO of Digital Virgo Group

Signature Page to Non-Disclosure Agreement

DocuSign Envelope ID: 1BF054D9-7E14-4969-B862-D15C8A300556

**EXHIBIT A**

See attached Excel file

Signature Page to Non-Disclosure Agreement



